Please, the Court, Allen Hyman for the appellant. I wanted to go into some particulars and I wanted to go into some generalities on this. I know the Court's read the briefs and considered the matter of judicial estoppel and the Court's ruling below. The particularities, first of all, we have these alleged, these incidents that supposedly take place in August, but the defendants don't file their motion until February 15, 2008, five-and-a-half months go by, five-and-a-half months go by, and $280,000 is spent by them. And during that five-and-a-half-month period, we have statement after statement which does nothing but trade us. On November 13th, this is tab 25, a joint statement, customers of Larin, they copied the box, they copied the all-trade box. Well, what point are you making there? Well, all I'm making is, if the point I'm making is that if you take the joint statements in December 25th, where they go ahead and say, Larin's complaint is narrowly drawn, and they only identify one box with the colors copied by one to the other, that there was a series of five months between where they claim August, these deceptive facts, to the time they filed a motion for summary judgment, claiming that they were deceived. And during that five months, everything and everything had to do with trade us. And the first stuff that's true. But what kind of game were you playing when you answered the interrogatories that this case isn't about trade dress? I answered the interrogatory. I think when you say game, it's presumed to be a game. Well, I don't presume it to be a game, but it was certainly confusing. It was confusing because we had both the stool issues and the configuration of the chair issues there. And I was trying to, I got a little mixed up, a little dyslexic with regard to we had the stool. And I was trying to not say that the issues involving the stool were trade dress. And that the sculpture of the stool, and this in the stool, and that in the stool was not trade dress. And when I go ahead and say trade dress being configuration at a deposition, I'm saying, and no one says, well, what are you talking about? Are you talking about the stool? Are you talking about the box? So forth and so on. I mean to say one interrogatory, and the answer to the one interrogatory in August. Well, I think then there's a letter. Isn't there a letter? There's a letter which says, I am not proceeding with trade dress in the stool or the box. That's right. At the same time. OK, but let me just stop right here. Do you understand that the, in classic Lanham Act section 43A speak, that in fact, copying the look and feel, if you will, of the box is known as trade dress? Yes. But when then, so when you say I'm not claiming trade dress in the box, you're now saying, well, of course, what I'm meaning is I'm not saying that the shape of the box is trade dress. But in fact, the colors, the design and all that, that is under section 43A what we call trade dress. Absolutely correct. And I was confusing at that point. It was a deliberate, was it intentional, was it as ascribed by the court? Not at all. It was, it was, we had the stool, we had their claim to get rid of the supplemental registration, and it was just at the time, at that time only, in August, those were the only items throughout a huge amount of months of everything else was trade dress, trade dress, trade dress. And yes, there's some confusion there, but it is not confusion upon which anyone relied, and I'll tell you why. First, some rejected motion. I, this is tab 143, 4609. I respond, Ligon had authority to stop the sale of the alleged infringing trade dress. That's the first one. On this proposed statement of facts, acts of intentional copying of another party's trade dress. This is in January. Most importantly, in December, there's all these depots being taken. And in December, we filed two motions, and the two motions says, Laron asserts defendants copied Laron's stool and copied the trade dress. And those were filed two motions in December before the magistrate, and then were appealed up on because the magistrate denied them in January. They were filed twice. And what they say in tab 25, 717, in response to the motion for reconsideration of the magistrate's position, it was, do you have, are you telling us that this is a trade dress case? Absolutely. I said it was a trade dress case. You said it already. Right. Okay. But with respect to the, as Judge McKeown was explaining, with respect to the design, the color of the box and the photographs on the box, isn't that right? Right. Why didn't you just tell the judge that? Why didn't you tell the judge that? I said that to the judge. When did you make it clear to the judge that that was your trade dress claim? It was in the box. Now, when did you say, the words, you know, Judge, when we're talking about trade dress, we're talking about the color, we're talking about the photographs on the box, we're talking about the overall design of the, on the box. Well, I said. When did you tell that to him? In January. I mean, the first time that the Federal judge was in these motions for reconsideration of the magistrate's order, I said, in the motions for reconsideration of the magistrate's order where they wouldn't allow discovery, I said to the court, Larin asserts defendants copied the Larin school and copied the trade dress of Larin's box, the colors and compositions of the photographs. That was said in. And that, and did you say, and that's our claim? Yes. And that's what, that's our claim. What page are you reading from, just for our reference? I'm reading from, let me just go ahead here, this is tab 52, Larin asserts the defendants copied the Larin school and copied the trade dress of Larin's box and colors. Tab 152, 5297, in response to the first motion for summary judgment. In fact, that's said twice, also said at 25, 5147, said twice. In the first motion for summary judgment, January 31st, in responding to why their principle shouldn't be held in, I say, tab 143, 4609, in response to summary judgment, Livian had the authority to stop the sale of the alleged infringing trade dress after service of the complaint and did not do so. That was in response to the first motion for summary judgment. I sent in a proposed statement of decision, 144, 4639, tab 144, acts of intentional copying of another party's trade dress provides a presumption of goodwill, a presumption of goodwill and defendants' intent to confuse is presumed. And I say, tab 144, 4640. You're not saying there that the intentional copying of the photographs, the coloring, the overall layout of the box is what the trade dress, is the essence of the trade dress claim. You're just saying trade dress, and then you say, well, we're not pursuing a trade dress claim. No. That was in the – well, you're saying that, but that was in the statements. That was also a – there's a contention of memorandum of facts and law, which goes into it. There's all the jury instructions. Everything else is trade dress. Where's the prejudice? So then we have these people here from August. They don't do anything other than take depots and motions and everything from August to September 15th. The first motion for summary judgment is that the officers are not liable, and I say, yes, they are. They could have stopped. This trade dress, which – and I go ahead and I actually say the – oh, yes. In their joint statement to the court, where I tried to look at tab 25-717, this was in December 20th, where they say – where I'm trying to take discovery of boxes sold outside the country, Larin chose to be very specific as to the box and school. This is their language. This is consistent with Larin's original complaint that averse that the alleged box intentionally duplicates the colors and photographs of the Larin box. That's their words on December 20th in two joint statements. That's tab – When you – when you gave your definition during the, I believe, deposition, you told us you just – you realized it was confusing. It was – yes. Well, I – you know, back in August, in that deposition, I was concerned about the fact that you have a lot of law concerning configuration with regard to the stools, and we're not asserting trade dress in the stool. They have a counterclaim for trade dress on the – to get rid of the registration, which has elements of trade dress in the stool. So I'm saying we're not asserting any of that. And they bring a motion for summary judgment, and I just say, listen, they're infringing our trade dress, but let's get down to the fundamental issue. The fundamental issue was prejudice. They say, we didn't ask – in the brief, and he also said that before the Court – we didn't ask whether Larin's box was inherently distinctive, whether it required secondary meaning. And the judge, when they brought that up, and then after they lost it, they brought a motion for reconsideration on one thing only, Hyman's activities in other courts. That was on April 3rd. They lost the first motion for summary judgment, and then they go ahead – Well, listen, we have a good – we understand your argument, but you want to save a few minutes for rebuttal? Oh, yeah. Let me just say – You know, your time is marching on. You know, they only had – when they said that we didn't ask this stuff about this, the judge at 1273, tab 36, says, you're going too far. That's a deposition of a lawyer, not a lay witness. You wouldn't ask them about whether or not it had secondary meaning and things of this nature. And when, in court, on the last day, the judge first says, there's a whole lot of discovery here about trade rests, about these witnesses. And they start talking, and the Court says, you know what, there's a whole lot of discovery about trade rests. And the Court says, but there's nothing ever alleged as to false advertising. And that's when they go into that argument. I presented in my reply brief where they make up all that law about how false advertising is the same as trade rests. And that was a misrepresentation – that was a misrepresentation to the Court. All right? Thank you. Good morning, and may it please the Court. My name is Dillon Ruga. I'm Steptoe & Johnson here on behalf of Pelley's. Let's not sugarcoat what we're looking at here. Mr. Hyman uses nice euphemisms as incidents that happened way back when. In this case, we're talking about deliberate deception, when you have a sworn interrogatory response that asks, is this case about trade rests? The answer, quite simply, no. He gave it a – he gave it his own meaning, though. He defined trade rests in that interrogatory. Well, I'm sorry, but that interrogatory had a definition of Larin's box. The specific interrogatory asked, do you claim – do you contend that defendants infringed a trade rest in Larin's box as Larin's box is defined in the complaint? There's no ambiguity in that interrogatory. But then he says plaintiff defines trade rests as limited to the shape of the packages and containers, and then he says he doesn't contend that they've infringed a trade rest in the box. Okay. Well, now he's telling you something else, but that's not enough, because after he sent that interrogatory response, he sends me a threatening letter, threatening to sanction me if I continue to ask him about trade rests in the box or the stool. So, you know, I get this interrogatory response. I get the subsequent letter threatening sanctions if I go down this road of trade rests. And the next thing that happens is we take the deposition of Larin's president. So you say he – Mr. Hammond sent you a letter threatening you with sanctions? That's correct, Your Honor. If you get into this road about trade rests? That's correct, Your Honor. So what have we done with that letter? It's in the record. Yeah. It's at tab 122, page 3444 to 45. All this was an interrogatory, right? Right. So it was – we have a sworn interrogatory response followed by the threatening letter. I'll read to you the relevant portion of the letter into the record. It says, as well, defendants propounding contention interrogatories directed to Larin's trade rests in its box and in its stool, which are not the subject matter of this lawsuit, again cause Larin to incur additional fees, which contention interrogatories will be presented post-trial as a basis for Larin's attorney's fee award. That's a threat? That's a threat, Your Honor. Well, you have – we must live in a pretty mild world of discovery. That seems to be a fairly standard kind of letter that lawyers send each other regretfully. But that is not – I don't see the threat there. The problem is – let's get to the bottom line. When you have a proposed pretrial order and the proposed instructions, everybody knows that this is about the color of the box and what the box says. I mean, is there anywhere that you're misled on that point? Forget what you call the thing. Well, yes, Your Honor, because as you know, the Lanham Act encompasses both false advertising and trade rests. You don't have to take our word that this was a false advertising case. Mr. Hyman tells Magistrate Judge Parada that this is a false advertising case. He affirmatively makes a statement, this case is about false advertising. So we litigate the claim, Your Honor, all the way through, prepared on the eve of trial to defend against a false advertising case. Now, as you know, the false advertising could have a literally false statement or an appliedly false statement. That comes from the Southland Sod Farms decision from the 9th Circuit. But how could you possibly think it was a false advertising when you're asking questions about the color and the content and that's what they're saying in all their pleadings, forgetting how you characterize it. The case does proceed with people talking about the color of the box and how things are configured on the box, not the shape of the box. Right, because it was the position of Larin that those particular similarities created the implicitly or impliedly false statement on our box. In other words, it was their position that because the boxes look so similar, someone would falsely believe that they were purchasing plaintiff's stool when in fact they were purchasing our stool. And so what we didn't ask about were any questions about or inherent distinctiveness, which issues don't arise in a false advertising case but are necessary in a trade dress case. But they're both pretty close in a case like this. Well, when you say they're both very close, are you saying false advertising and trade dress is very close? Yeah. But there are a lot of claims that are very close. Fraud versus negligent misrepresentation. A lot of elements overlap. Let me ask you this. Do you think that your client's product looks a lot like Mr. Heyman's client's product? Absolutely not, Your Honor. What? Absolutely not. In my eyes... I didn't hear the last word. Absolutely not. Not? Not. That's correct. In my eyes, when I look at these products, the boxes, I see all the similarities, you know, and I could list them for you, but in my eyes, they're not similar at all. I'm not talking about the box. I'm talking about the stuff in the box. Well, the stools themselves are not at issue here, Your Honor. I know, but I'm just asking. Well, certainly there are some similarities between the stools themselves. Whether that's, you know... If you're asking me whether I think my clients are liable under the Lanham Act, certainly not. You know, I didn't ask you that question. No, but certainly there are some similarities between the stools. Both were motorcycle saddle stools, which happen to be pretty generic, on top of these elevating shafts up and down. But one of the difficulties that I'm having in the case is fitting it into the legal construct of judicial estoppel. So one of the elements there is that you need to have the court having actually bought in or gone down the path of accepting something that was allegedly misleading or whatever. Well, given the history of this, where the judge says summary judgment denied, and then, of course, the next decision is contrary, where does the court buy into this? Where do we get the court element of judicial estoppel? No, no, I'm not sure that that element is necessary in order to find judicial estoppel. In fact, the New Hampshire v. Maine case, which comes from the United States Supreme Court, lists the elements and says that these are not inflexible prerequisites to finding judicial estoppel. Meaning that no one particular element is necessary in order to find judicial estoppel. But if you were to go down that road, my arguments would be twofold. Number one, the argument has been waived because Mr. Hyman did not make that argument to the district court and has not made that argument to your honors. Secondly, even if you get past the waiver issue, which I don't believe you should, but if you do, as an officer of the court, I'm standing before you and telling you that I was misled during the course of this litigation and that should be enough to invoke judicial estoppel. Well, that would hardly be the basis. I mean, you might have been misled. We have to look at the record as to what, you know, where did this case end up, you know, at the time of trial. There's confusion. I just am wondering whether judicial estoppel is the right course or sanctions under Rule 37. Sure. Would you comment on that? Judicial estoppel is obviously an equitable doctrine that is created to prevent the exact type of gamesmanship that occurred in this case. In fact, judicial estoppel was created, this case is the poster child for judicial estoppel, where you have one party affirmatively taking a position in a case and then doing a complete 180 on the eve of trial. I don't believe that there could be any clearer case of judicial estoppel and what that doctrine stands for than what we have before Your Honors. And to touch on the issue of sanctions, I don't believe sanctions would be adequate here, Your Honor, because if you were to sanction Mr. Hyman only under Rule 37, you would have to reopen discovery so that we can take the depositions and get back into these elements that we did not inquire to. What's missing from your deposition specifically with respect to, you know, the ultimate claim here for the jury is whether there's confusing similarity under 43A that would amount to in terms of the trade dress of the box. Well, there are different elements, again, under false advertising versus trade dress. No, that's not my question. My question is what questions didn't you ask or what information don't you have in order to defend against Section 43A violation? I'll give you three things that we need specifically. One, evidence regarding secondary meaning. Two, evidence involving inquired, excuse me, inherent distinctiveness. And three, a survey. You've got to keep your voice up at the end of your sentence. Excuse me. I hear, like, inherent distinctiveness. You know, say inherent distinctiveness. Pardon me, Your Honor. Secondary meaning, inherent distinctiveness, and perhaps most importantly, a consumer survey would have to be redone on the issue of trade dress infringement versus the issue of false advertising. Because in the case before we got to trial, we did do a confusion survey, and that survey was directed at whether consumers believe that there was a false advertisement here as opposed to whether consumers believe that there was trade dress at issue. So each of those things would need to be reopened, and our clients have incurred hundreds of thousands of dollars preparing for this case. They would need to somehow be reimbursed for that amount. But secondly, employees who were there at the time and have since left the company, those employees would have to be found, and whether or not they would, you know, be willing to appear at trial at this late date is unknown. In a nutshell, the evidence that we had originally going into the trial may not be there now. Let me ask you about the pretrial order, which... Why do you need that? Why can't you just bring the boxes in, let the trier of facts look at them? Well, if that was the case, then we would never need to go through the normal discovery process at all. It would just short-circuit it. You wouldn't have to spend hundreds of thousands of dollars. Well, it's very important, Your Honor, to have a consumer survey done and have an expert opine as to any confusion between the boxes. It's also extremely important, and one of the elements that plaintiffs will have to demonstrate at trial, again, is the secondary meaning versus inherent distinctiveness, and we, of course, will need our rebuttal evidence, which will be gathered through the course of discovery. Well, speaking of that, the pretrial order, which looks to be filed April 11, 2008, it's a final pretrial conference order. Is that a joint order? I believe it was, Your Honor. All over that thing, it talks about trade dress and secondary meaning and inherent distinctiveness and affirmative defenses that you have. I'm sorry, Your Honor. I may have misspoken, and Mr. Hyman may have filed his own pretrial conference order because he was unwilling to cooperate with us at that time to prepare a joint. My question is, did you file a joint order or did anything happen to this pretrial conference order? There was eventually a joint pretrial conference order that was signed, and let me see if I can find it for you. I mean, this is signed by two lawyers, someone from All Trade. I can't tell if it's Mr. Kim or you, but it's signed by you. And it's all over. This is where I'm having some confusion because all over it talks about trade dress and secondary meaning and claims. As you know, when a joint pretrial conference order is prepared, both parties are allowed to put in their respective positions. I'm not allowed to comment on Mr. Hyman's position. He's not allowed to comment on my position, and that's submitted as a quote-unquote joint pretrial conference order. But it does not reflect my belief that what he's saying is correct. I'm just looking at the part that says defendant. That's you, right? So what we need to do I'm not talking about his claims. I'm talking about your claims. So what happens is we receive his portion of the joint... We all understand how pretrial conference orders work. I'm asking you who put in the defendant's defenses. Your Honor, I believe that was me. And you signed this thing. And then I signed the thing. And the reason why, Your Honor, is because at that time when that was submitted, we did not have a ruling that Mr. Hyman was going to be judicially estopped. So he had flip-flopped. He had gone from false advertising back to trade dress, and we didn't have an order at that time that he was going to be judicially estopped from asserting that claim. So as careful, prudent lawyers, we had to prepare our defense on a trade dress claim, assuming that the district court would allow that to go forward. We couldn't simply take the position that this claim has been waived, and we're not going to address it. We had to include that in order to adequately represent our clients. And you say you have testimony from your experts that the product has not acquired a secondary meaning, no likelihood of confusion, etc., etc. That doesn't change whether or not the judge rules one way or the other on your motion. Right. Again, Your Honor, we took that position because we had to at that late part of the game, without knowing what theory the district court judge was going to allow Mr. Hyman to go forward with. There was no other path for us to take. Well, you just could have called up the clerk and said, you know, we've got a problem, we'd like to talk to the judge about it, and here's our problem. And my guess is he would have said, come on down. Right. But then you go on, how much money did you spend after that? Well, what happened was we filed our summary judgment motion and we filed a motion to eliminate arguing that he should be judicially stopped from arguing trade dress infringement so that the district court judge would have the benefit of our legal arguments and the evidence that we submitted to the court. So unless Your Honor have any further questions, I'll thank you. It's the first time I've seen a computer used during oral argument. I asked my secretary yesterday to put all of the paper record in electronic form so I didn't need to carry it all down to the courthouse. It's just easier to pull it up electronically. You're a modern man. Maybe next time you put all your stuff in a computer. I'm not that modern. I'm sorry, Your Honor.  I'm not that modern. You like paper, don't you, Mr. Hyman? Paper? I do. I'm used to it. You've received about 12 volumes of the excerpts of record? Well, and you know what? It's all the same thing over and over and over again and it just says trade dress over and over and over again. The court denied their motion for summary judgment. On March 19, 2008 when they first brought their motion the court said they didn't address the trade dress issues in the complaint. They went ahead and they brought up this interrogatory thing in August they brought up that and that doesn't matter and it doesn't mean anything and if you look at tab 7 the court initially denies everything they talk about with regard to estoppel and summary judgment. What happens between March 19 and 3 days before trial to change the court's mind? It isn't the fact that they didn't ask questions about inherent distinctiveness because the court says at tab 30 the hearing before the final hearing tab 36 at 1273 they say we didn't ask about secondary meaning distinctiveness the court says you're going too far with that. This is a deposition not of a lawyer of a lay witness. Do you really expect to have questions about secondary meaning? The court says and then What about the argument that the whole survey was directed to unfair advertising as opposed to They never brought that up. I'm just asking you. Because their whole survey they didn't even they did a survey not about false advertising. Their survey was he chose 15 stools and they had somebody go ahead and do a sample of people looking at this stool or that stool to see if they would be deceived as to the stool. If there was confusion in the stool. That's the survey they did. And the judge said stools have nothing to do with this case I'm not going to allow the survey So the survey they did was they did a survey comparing But they're saying if they'd known it was about the color of the box their survey would have put the boxes up Well that's very interesting isn't it because all we said in is trade dress trade dress trade dress and they wait till after the discovery cut off make an ex-party application to file the second motion for summary judgment They don't do it on the first motion for summary judgment where I bring up trade dress and it gets denied and then they extend the period to March 10th beyond March 3rd with a February 4th discovery cut off date and these things took place in August What are they doing from August to February other than us filing joint motions saying trade dress trade dress trade dress other than me trying to get trade dress discovery for boxes sent out of the country what are they doing and then what happens here he says the final day the final day on August 16th the court says to them there was an awful lot of questions this is at 1170 he says the court says at the final hearing there's an awful lot of questions about trade dress you ask both of these people tons of questions about trade dress I don't understand what's wrong and you examine them 1170, 1171 and then the court says to them now wait a second you're talking about false advertising and the court says I haven't seen anything that was supportive of false advertising claim I don't see anything in the complaint where do they ever say that anything is false and that's where they misrepresent the law of the court and it was on that afternoon and the court didn't allow me to respond and I sent my reply brief when they went ahead and said it's one of the false advertising and unfair competition and trade dress is the same and that was a misrepresentation of the court and that's the difference the court relied on that and I never got a chance you've got to get close to the microphone the court relied on that and I never got and I'll just close with this he says he's deceived a joint statement in October my statement, blaring design box, distinctive advertising coloring design of the advertising pictures of persons in the garage they copied the color design and they caused customer confusion and lost their goodwill and engaged in intentional false advertising I could have said they engaged in intentionally emotional distress he's relying on the last two words when I say they're comparing the boxes and the colors and he's saying I was deceived he said false advertising I could have said well they engaged in intentionally false emotional distress I was deceived there was no deception that's a new theory ok thank you, matter is submitted
judges: Pregerson, McKeown, Paez